UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CEDRICK T. FLAX, ) | |
| ) | |
| Plaintiff, ) | 17 C 7087 |
| ) | |
| vs. ) | Judge Gary Feinerman |
| ) | |
| DAN ARTL, LUTHER MANNING, BRANDI KEYS, ) | |
| JUNETTE BENNETT, DWAYNE JOHNSON, ) | |
| DEREK ANDERSON, LENORA PARHAM, ) | |
| LASANDRA TERRELL, LESTER HAWK, JAKE ) | |
| MATTHAYA, CHANDRA FIELDS, STEVEN ) | |
| JAMES, JAMES MORGAN, and STUART KOCH, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

In this *pro se* 42 U.S.C. § 1983 suit, Illinois prisoner Cedrick Flax alleges that correctional officers Dan Artl, Stuart Koch, Luther Manning, Brandi Keys, Junette Bennett, Dwayne Johnson, Derek Anderson, Lenora Parham, LaSandra Terrell, Lester Hawk, Jake Matthaya, Chandra Fields, Steven James, and James Morgan retaliated against him in violation of the First Amendment for engaging in protected activity and that Artl and Koch used excessive force against him in violation of the Eighth Amendment. Doc. 48. Defendants move for summary judgment, arguing that Flax failed to exhaust his claims and that the evidence would not permit a reasonable jury to find for him on the retaliation claim. Doc. 181. The motion is granted as to the retaliation claim against Bennett, Johnson, Parham, Terrell, Hawk, Matthaya, Fields, James, Anderson, and Morgan, and otherwise is denied.

**Background**

Consistent with Local Rule 56.1(a)(3), Defendants filed a statement of undisputed facts along with their summary judgment motion. Doc. 183. As required by Local Rule

1

56.1(b)(3)(B), Flax filed "a concise response to [Defendants'] statement … contain[ing] … a response to each numbered paragraph in [their] statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." N.D. Ill. L.R. 56.1(b)(3)(B). Defendants contend that Flax's responses to ¶¶ 6, 13, 16, 41, and 43 of their Local Rule 56.1(a)(3) statement should "be stricken … because they contain improper arguments, legal conclusions, and do not specifically respond to the fact." Doc. 207 at 1-4. The court will not rely on any legal conclusions in Flax's Local Rule 56.1(b)(3)(B) response and will deem admitted any facts asserted and appropriately supported in Defendants' Local Rule 56.1(a)(3) statement to which Flax does not properly respond.

Because Flax is *pro se*, the court will deem his "Disputed Material Facts," Doc. 194, to be a Local Rule 56.1(b)(3)(C) statement of additional facts. *See Johnson v. City of Chicago*, 2016 WL 5341810, at *2 (N.D. Ill. Sept. 23, 2016). Defendants challenge each paragraph of that statement for being "a narrative in the form of a question." Doc. 208. Rather than disregarding Flax's Local Rule 56.1(b)(3)(C) statement in its entirety, the court will credit it for any factual assertions that are supported with record evidence. Flax also filed a declaration, Doc. 194 at 8-17, which Defendants ask the court to strike on the ground that it is "a conclusory recitation of [his] complaint," Doc. 207 at 4. Rather than strike the declaration, the court will determine whether any portion qualifies as admissible evidence. Defendants finally assert that the court should strike certain exhibits to Flax's Local Rule 56.1(b)(3)(C) statement because he does not rely on them. *Id*. at 4-5. The court does not rely on them.

The court recites the facts as favorably to Flax as the record and Local Rule 56.1 permit. *See Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018). At this

juncture, the court must assume the truth of those facts, but does not vouch for them. *See Gates v. Bd. of Educ. of Chi.*, 916 F.3d 631, 633 (7th Cir. 2019).

Flax is an Illinois prisoner currently housed at Menard Correctional Center. Doc. 183 at ¶ 1. Artl, Koch, Manning, Keys, Bennett, Johnson, Anderson, Parham, Terrell, Hawk, Matthaya, Fields, James, and Morgan are correctional officers at Stateville Correctional Center. *Id*. at ¶ 2.

On January 7, 2016, Flax submitted a grievance regarding events that took place at Markham Courthouse (part of the Circuit Court of Cook County, Illinois) on December 30, 2015. *Id*. at ¶ 5; Doc. 186-1. The grievance form instructed that it be sent to the Administrative Review Board ("ARB") "only if the issue involves … issues from another facility," and Flax—who on December 30, 2015 was housed at Stateville, and on January 7, 2016 at Pontiac Correctional Center—wrote that his grievance related to an "[i]ssue from another facility" (*i.e.*, "Markham Courthouse/Stateville") and submitted it to the ARB rather than to the Pontiac Grievance Office. Doc. 186-1; Doc. 183 at ¶ 7.

The January 7, 2016 grievance stated in pertinent part:

> This grievance is being filed on and against the following person(s) C/O Bubba, C/O Keys, C/O James, C/O Fields, C/O Anderson, C/O Hawks, C/O Morgan, C/O Mattieho, C/O Terrell, Assistant Warden Nichols, Lt. Brady, Lt. Artl, Tactical Response Team (Orange Crush) and any and all John Doe & Jane Doe employee[]s of IDOC not mentioned herein by name who[] were present at Markham County Courthouse on 12-30-15 (December 30, 2015) date of issue(s) being grieved.
>
> On 12-30-15 eleven (11) inmates including this grievant Flax #M-16320 were at the Markham County Courthouse. … We all at about or around 1:30 pm had been to court and were finished. (Flax/grievant[] never had court in that county to begin with[.]) At about or around 2:30 pm C/O James and C/O Bubba were requested to be talked to by inmates Tribble and Flax/grievant. At that time the bullpen door to which all eleven (11) inmates w[]ere held was then opened and C/O James approached the bullpen. Flax/grievant stepped out of the bullpen and informed C/O James that he did not have court in that county, that he needed to call his lawyer, so did C/O James know what time everyone would be leaving, because all inmates had been done for at least an hour.

> C/O James told this grievant that he did not know when we would be leaving. This grievant then asked C/O James[,] "What are y'all (C/Os) trying to get overtime pay"?
>
> At that moment C/O Bubba approached this grievant, hostile and aggressively, yelling[,] "Ain't nobody got time for this raperman." (referring to the nature of this grievant/Flax['s] case). As this grievant/Flax continued to talk to C/O James the bullpen door began to close while this grievant/Flax was standing in between the doorway which was stopped by this grievant[']s/Flax foot.
>
> At that moment C/O Bubba walked off and returned seconds later approaching this grievant[']s/Flax right side, C/O Bubba then took his left hand and grabbed this grievant[']s right arm shirt sleeve and pulled this grievant into him (C/O Bubba). At that time inmate Hardy appeared behind this grievant and questioned C/O Bubba as to why he was pulling on this grievant/Flax. C/O Bubba then released this grievant/Flax and stated[,] "[O]kay we about to go." Then he told the other C/Os to cuff all the inmate[s]. All inmates were then handcuffed with lockboxes and waistchains and placed into bullpens without incident. Each inmate sat inside those bullpen[s] from at least 2:50pm until "Orange Crush" arrive[d] at about 7:30-8:00pm, requesting to use the toilets for (bowel movement) without tissue. All request[s] were ultimately denied. During the period inmates sat in the bullpen[,] C/Os sat around playing cards[,] eating Harolds chicken, making remarks about this grievant/Flax['s] case, such as "Blame raperman, Raperman started this, Raperman is the muthafucka from Stateville" and laughing. This grievant/Flax and other inmates informed the C/Os that we would be writing them up for stealing overtime, as well as filing lawsuits for cruel & unusual punishment and retaliation. At about or around 6:00pm Assistant Warden Nichlos arrived followed by Lt. Brady, then Lt. Artl and Tactical Response Team "Orange Crush." Five inmates … w[ere] then removed and taken to Pontiac C.C. Due to "Orange Crush" use of unnecessary excessive force (authorized by Lt. Artl) refusing requests to utilize safety seatbelts (per Lt. Artl & Lt. Brady) and tight and improper use of restraints, I have suffered injury to my back (lower & upper), neck, chest and received abra[sions] on my arms and wrist. As of 1-7-16 no inmate involve[d] has been served any disciplinary/IN ticket.
>
> Therefore, it is being alleged by this grievant that he and other inmates were sent to Pontiac out of retaliation for grievant[']s/Flax case and or for threat[en]ing to write C/Os up for stealing overtime and filing lawsuits.

Doc. 186-1. Although Flax asked for "any and all tickets" to be expunged, *ibid.*; Doc. 207 at 2, he denies that his grievance was "in regards to the disciplinary tickets that he received," Doc. 183 at ¶ 6; Doc. 193 at ¶ 6. Rather, Flax's grievance was broader: he asked for an investigation

4

into the officers' alleged stealing of overtime, reprimands for officers, expungement of any future tickets, an injunction, and the reversal of his transfer from Stateville to Pontiac. Doc. 186-1; Doc. 191 at 4.

Flax mailed an "amended" January 7, 2016 grievance to the ARB on March 14, 2016, after he received access to a videotape of the events at Markham Courthouse on December 30, 2015. Doc. 193 at ¶ 11; Doc. 186-6 at 2. The amended grievance was not found within the ARB's or Grievance Office's files, and the grievance Flax made part of the record does not include a counselor response or a grievance office stamp. Doc. 183 at ¶¶ 11-12.

Flax submitted a second grievance on February 26, 2016, concerning the same December 30, 2015 events and also the subsequent disciplinary proceeding he faced and discipline he received at Pontiac. *Id*. at ¶¶ 8-9. That grievance stated in pertinent part:

> On 12-30-15 I went to court in Markham County from Stateville Correctional Center. [W]hile at the courthouse all inmates had been to court and were done by approximately 1:45-2:00pm. At or about 2:30pm Officer[s] Manning and James were called to the holding which held eleven inmates. The door was then opened by c/o Manning from the control room and c/o James approached the cell door. This grievant stepped out and informed c/o James th[at] he didn't have court in that county and since everyone was done did he know what time we'd be leaving. He stated he did not know. This grievant then asked[,] what are y'all trying to get overtime pay? At that moment c/o Manning approached this grievant saying[,] "ain't nobody got time for this raperman." As this grievant is leaning in the doorway of the holding cell it began to close on grievant's foot. C/o Manning then walked off into the control room, returning seconds later approaching this grievant['s] right side and grabbing his right arm shirt sleeve, pulling this grievant into him. At this time inmate Hardy #M-20445 appeared behind me and asked c/o Manning[,] "why was he grabbing for doing nothing." He the[n] said to c/o Manning[,] "let him go." C/o Manning released me and stated[,] "okay we finna go," and the order the c/os to cuff all the inmates up, c/o Keys stated[,] "they are gone[,] have to wait [']til c/o Hawks and Anderson and Johnson get back from the restaurant." C/o Manning told c/o Keys[,] "no cuff them up." All inmates w[ere] then cuffed with waist[] chains and lock boxes and placed into separate holding cells, 5 inmates in one and 6 in the other. (1) At no time did this grievant assault any officer(s) (2) once orange crush arrived this grievant was assaulted by an orange crush member in the van for requesting the list of

> names this grievant had in his pocket for his lawsuit which was tooling by Liuetant Artl, Lt. Artl then said[,] "oh you[']re gonna file a lawsuit["] then told the officer in the van to "give him something to write about and make it hurt." [A]t that time the "O.C." member began push[ing] my head down by the neck and hitting in my back[,] neck[,] and head[,] then he place a leg iron on my wrist and hooked it to the floor so I couldn't sit up. This grievant asserts these charges have been brought against him as a direct result of retaliation due to the nature of his case and/or accus[]ing C/Os of stealing overtime. On 1-8-16 this grievant was asked by officer Tutor did he want to hear his ticket, this grievant informed officer Tutor that he was never served a ticket and requested officer Tutor to find out if it was in fact this grievant being called and find out the charges against him. [C]/o Tutor returned and told this grievant it was him being called & it was for a fight or something. [B]ut that he informed the adjustment committee that the grievant refused. (4) This grievant never refused to go to the hearing. This grievant nor any of the other inmates received copies of tickets. Stating the charges … will verify this from 12-30-15 through 1-8-16 by this grievant not being served prior notice of the charges against him at least 24 hours prior to any hearing being held is a substantial violation of grievant[']s due process denying him a meaningful opportunity to marshal the facts, present evidence, call witnesses, and prepare a defense. [Furthermore] by this grievant being consequently denied to attend the hearing is a due process violation, especially where good time was taken. The adjustment committee found this grievant guilty simply as the r/os statement as written it did not even utilize the hearing officers finds because if it would have[,] inmates Flax, Thompson and Hardy would have been found not guilty.

Doc. 186-5. Flax also filed multiple status updates with the grievance officer and his counselor. Doc. 193 at ¶ 10.

Flax disputes Defendants' assertion that he submitted the February 26, 2016 grievance directly to the ARB, Doc. 183 at ¶ 10, instead maintaining that he submitted it to the Pontiac Grievance Office, Doc. 193 at ¶ 10. Flax supports his version of events with factual averments in his declaration, Doc. 194 at pp. 13-14, ¶¶ 43-45, so the court at this stage credits his account. *See Johnson*, 892 F.3d at 893. Defendants invoke the sham affidavit rule in urging the court to disregard Flax's averments, but they do not explain why the rule applies or attach the portions of Flax's deposition that supposedly contradict his declaration. Doc. 207 at 7 (stating that the deposition transcript was attached as Exhibit A, but not attaching any exhibit).

Flax submitted a third grievance on September 26, 2016, seeking a status update about his February 26, 2016 grievance. Doc. 193 at ¶¶ 13-14. The nature of the grievance was described as "staff conduct" and "[g]rievance update denial." Doc. 186-5 at 4. The grievance stated in pertinent part:

> I filed a grievance with all my exhibits in regards to my unconstitutional segregation confinement on 3-2-16[.] I have filed three request[s] for status updates on that grievance with the counselor and only received one response which was that my request was forwarded to the grievance officer, I've also sent three status updates request[s] to the Grievance Officer(s) to no avail it's been over 6 months with no response. I have witnesses who have signed that they observed me sending these request[s] and have read the copies.

*Ibid*. Defendants contend that Flax's description of his grievance as a status update should be stricken because it concerned his segregation. Doc 207 at 3. But while the relief Flax sought included release from segregation, he specifically asked to "receive a status update on [his] seg grievance." Doc. 193 at ¶¶ 13-14; Doc. 186-5 at 4.

Flax did not inform Manning, Keys, Bennett, Johnson, Anderson, Parham, Terrell, Hawk, Matthaya, Fields, or Morgan at Markham Courthouse on December 30, 2015 that he intended to file any grievance or lawsuit. Doc. 183 at ¶¶ 17-40; Doc. 193 at ¶¶ 17-40. Keys and Manning were directly outside the holding cell where Flax was being held, and they observed him planning and preparing with other inmates to file grievances. Doc. 193 at ¶ 43; Doc. 194 at p. 4, ¶ 26 (citing Doc. 194 at p. 11, ¶ 25). Defendants challenge under the sham affidavit rule Flax's assertion that Manning and Keys could hear his planning and preparation to file grievances, citing Flax's admissions that he did not *inform* Defendants of his intent to file a grievance or lawsuit. Doc. 207 at 4. But those admissions do not contradict Flax's factual assertion, supported by his declaration, Doc. 194 at p. 11, ¶ 25, that Keys and Manning *observed* and *overheard* him planning to do so. *See James v. Hale*, 959 F.3d 307, 317 (7th Cir. 2020) ("[T]he

7

sham-affidavit rule applies to contradictions between an assertion in a party's summary-judgment affidavit and the party's prior sworn testimony.").

Keys and Manning filed incident reports and disciplinary reports against Flax arising from the December 30, 2015 events at Markham Courthouse. Doc. 183 at ¶ 42; Doc. 186-10. Bennett, Johnson, Hawk, Matthaya, Fields, Terrell, Parham, James, and Morgan completed incident reports as well. Doc. 183 at ¶ 42. James, Parham, Terrell, and Anderson were not present during those events and did not name Flax in their incident reports. *Id*. at ¶¶ 41, 44.

## Discussion

### I. Exhaustion

Defendants contend that Flax failed to exhaust his administrative remedies because he did not follow the required procedures for his grievances regarding the December 30, 2015 events at Markham Courthouse and subsequent disciplinary proceedings. Doc. 182 at 2-6. The Prison Litigation Reform Act states that "[n]o action shall be brought with respect to prison conditions under section 1983 … until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Porter v. Nussle*, 534 U.S. 516, 532 (2002); *Hernandez v. Dart*, 814 F.3d 836, 841-42 (7th Cir. 2016). Exhaustion of available administrative remedies "means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." *Woodford v. Ngo*, 548 U.S. 81, 90 (2006) (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)). To satisfy the exhaustion requirement, "a prisoner must file complaints and appeals in the place, and at the time, the prison's administrative rules require." *Pozo*, 286 F.3d at 1025.

"[P]risoners must take advantage of all procedures that are actually available," and courts "look to state law to see what remedies meet that test." *Williams v. Wexford Health Sources, Inc.*, 957 F.3d 828, 831 (7th Cir. 2020). At all relevant times, Illinois law required prisoners as a

general rule to first attempt to resolve an issue with a counselor and, if the issue remained unresolved or concerned discipline, to submit a written grievance to a grievance officer. 20 Ill. Admin. Code § 504.810(a). An exception required prisoners to submit a grievance directly to the ARB if it raised "issues that pertain[ed] to a facility other than the facility where the offender is currently assigned." 20 Ill. Admin. Code § 504.870(a)(4); *see Chambers v. Sood*, 956 F.3d 979, 984 (7th Cir. 2020).

Defendants contend that Flax violated these requirements by submitting his January 7, 2016 grievance to the ARB. Doc. 182 at 4. As noted, that grievance sought an investigation into the incident at Markham Courthouse and preemptively asked that Flax not be punished in connection with that incident. Doc. 186-1. Flax contends that because he grieved events that took place at Markham Courthouse and that involved Stateville officers, and because he submitted the grievance after having been transferred to Pontiac, the grievance "pertain[ed] to a facility other than the facility where [he] [wa]s currently assigned," which means that he properly submitted it to the ARB. Doc. 191 at 3.

Defendants' only response is that "[a]lthough the incident occurred at Markham County Courthouse, the Courthouse was not [Flax's] 'parent facility.'" Doc. 207 at 6. But Defendants do not explain why that is the relevant inquiry and offer no additional support or explanation. *See Haywood v. Baylor*, 804 F. App'x 401, 402 (7th Cir. 2020) ("We may assume, as [the plaintiff] argues, that this rule leaves open the theoretical possibility that an issue 'involves … another facility' if an officer from the inmate's current facility mistreats the inmate en route to that facility.") (omission in original). Defendants thus forfeit any other response to Flax's contention that Illinois law allowed (and perhaps required) him to submit his first grievance directly to the ARB. *See M.G. Skinner & Assocs. Ins. Agency v. Norman-Spencer Agency, Inc.*,

9

845 F.3d 313, 321 (7th Cir. 2017) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority."); *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) ("We apply [the forfeiture] rule where a party fails to develop arguments related to a discrete issue … .").

Defendants also contend that, at the time Flax submitted his first grievance, "there was nothing for [him] to grieve because he had not yet received any disciplinary actions." Doc. 207 at 6. But Flax's grievance not only asked that he not be disciplined for anything that happened at Markham Courthouse, but also sought redress for the alleged excessive force inflicted on him, Doc. 186-1—injuries that are at issue in this suit.

Defendants also argue that Flax's February 26, 2016 grievance violated Illinois law. Doc. 182 at 5. Specifically, Defendants contend that the grievance referenced "these charges" without identifying them and that Flax grieved retaliation for accusing Defendants of stealing overtime but not for any First Amendment protected activity. *Ibid*. Defendants' contention is unpersuasive. The grievance stemmed from events at Markham Courthouse on December 30, 2015, and Flax explained what he meant by "these charges." Doc. 186-5 at 6. Moreover, Flax emphasized that the charges resulted from "*his case* and/or accus[]ing C/Os of stealing overtime" and noted that an officer had "request[ed] the list of names this grievant had in his pocket for his lawsuit." *Ibid*. (emphasis added). And Flax's accusations that correctional officers were stealing overtime, and his gathering names to prepare a lawsuit, were part of the activity that he claims is protected—threatening to file grievances, Doc. 191 at 14-15.

Defendants next assert that Flax erred by sending the February 26, 2016 grievance directly to the ARB. Doc. 182 at 5. But Flax asserts, with record support, that he submitted that

10

grievance to the Pontiac Grievance Office, Doc. 191 at 5-6; Doc. 193 at ¶ 10, and the court must resolve that factual dispute in his favor at this stage. *See Johnson*, 892 F.3d at 893.

Defendants argue that the September 26, 2016 grievance was insufficiently specific because it failed to state factual details of the grieved incident. Doc. 182 at 6. Defendants do not explain, however, how the grievance failed to put the prison on notice of Flax's complaint given that it referenced earlier grievances that laid out the relevant facts. *See Turley v. Rednour*, 729 F.3d 645, 650 (7th Cir. 2013) ("[O]nce a prison has received notice of, and an opportunity to correct, a problem, the prisoner has satisfied the purpose of the exhaustion requirement.").

Defendants also contend that the September 26, 2016 grievance was untimely. Doc. 182 at 6. Flax responds that he submitted that grievance to obtain information on his February 2016 grievance because neither the grievance officer nor the counselor had responded to the earlier grievance, and that when he learned from his counselor that the grievance officer had not received the earlier grievance, he sought advice from the ARB. Doc. 191 at 6-7. The ARB directed Flax to provide a copy of the responses he had received, "if timely." *Id*. at 7; Doc. 186-5 at 2. At this stage, the court credits Flax's assertion, supported by his declaration, that he resubmitted the missing grievance with a letter establishing good cause for its possible untimeliness and that he received no response. Doc. 191 at 7; Doc. 194 at pp. 15-16, ¶¶ 54-55.

Defendants do not argue that this course, if Flax had taken it, would have violated Illinois law. *See Reid v. Balota*, 962 F.3d 325, 329 (7th Cir. 2020) ("An administrative scheme can be 'unavailable' to a prisoner when a prison fails to respond to a prisoner's grievance and, in so doing, prevents that prisoner from exhausting administrative remedies."). Rather, they argue that Flax has not "provide[d] evidence that he resubmitted his … grievance." Doc. 207 at 8. But Flax provides that evidence in the form of his declaration, which suffices at this stage.

11

Finally, Defendants contend that Flax's March 14, 2016 "amended" grievance was untimely and that there is no evidence that he submitted it because it does not bear a stamp or a counselor's response. Doc. 182 at 6; Doc. 207 at 8-9. At this stage, the court credits Flax's averment that he submitted the grievance directly to the ARB shortly after discovering additional evidence supporting his January 7, 2016 grievance. Doc. 193 at ¶ 11; Doc. 194 at p. 16, ¶ 56; Doc. 191 at 8-9. Defendants respond that permitting inmates to update previously filed grievances would allow them to "circumvent the Illinois Administrative Code at any time by filing grievances outside the required time frame and labeling the grievances as 'amended.'" Doc. 207 at 9. But Defendants cite no authority addressing the rules for supplementing grievances with newly discovered evidence, nor do they address whether Flax's obtaining the Markham Courthouse surveillance video, which prompted the amendment, would provide good cause for excusing its late filing. Defendants accordingly forfeit the point. *See M.G. Skinner*, 845 F.3d at 321; *Alioto*, 651 F.3d at 721.

In sum, Defendants do not establish that Flax failed to properly exhaust his claims. *See Ramirez v. Young*, 906 F.3d 530, 533 (7th Cir. 2018) ("Failure to exhaust is an affirmative defense for which the defendants carry the burden of proof.").

## II. First Amendment Retaliation Claim

"To prevail on a First Amendment retaliation claim, [Flax] must show: (1) he engaged in protected activity; (2) he suffered a deprivation likely to deter future protected activity; and (3) his protected activity was a motivating factor in the defendants' decision to retaliate." *Daugherty v. Page*, 906 F.3d 606, 610 (7th Cir. 2018). Flax concedes that summary judgment on the retaliation claim should be granted as to Bennett, Johnson, Parham, Terrell, Hawk, Matthaya, Fields, James, Anderson, and Morgan, but maintains that a jury could reasonably find for him on his claim against Koch, Artl, Keys, and Manning. Doc. 191 at 12-13.

As to the first element, Flax maintains that he "engag[ed] in First Amendment … protected activity when he expressed his intention to file a grievance and or lawsuit if necessary against correctional officers['] misconduct" and "when he discussed with other inmates and announced to them his intention take constitutionally protected action." Doc. 194 at pp. 3-4, ¶¶ 22, 25; Doc. 191 at 10. Defendants respond that the evidence shows that "[Flax] did not inform … Manning[ and] Keys … that he intended to engage in a protected activity." Doc. 182 at 8. As noted, however, there is a genuine dispute as to whether Manning and Keys were aware that Flax threatened to file grievances, and the court must credit Flax's account at this stage.

As to the second element, Defendants maintain that because Flax filed grievances and the lawsuit, "[he] was not deterred from engaging in First Amendment activity." *Ibid*. The pertinent inquiry, however, is whether the deprivation would *likely* deter future First Amendment activity, not whether it *actually* did. *See Holleman v. Zatecky*, 951 F.3d 873, 880 (7th Cir. 2020) ("This is an objective standard; it does not hinge on the personal experience of the plaintiff."). Because Defendants do not argue, let alone show, that the deprivations suffered by Flax would not "likely deter a person of ordinary firmness from continuing to engage in protected activity," *id*. at 881, they cannot obtain summary judgment on this ground. *See Perez v. Fenoglio*, 792 F.3d 768, 783 (7th Cir. 2015) (holding that the plaintiff, who had brought the lawsuit, stated a retaliation claim where the protected activity was filing a grievance and that the denial of medical treatment qualified "as a deprivation likely to dissuade a reasonable person from engaging in future First Amendment activity").

Defendants make no argument on the third element as to Koch and Artl. As to Keys and Manning, Defendants argue that no reasonable jury could find a causal connection between Flax's protected activity and Keys and Manning's alleged retaliatory conduct because Flax "did

13

not inform the Defendants that he intended on engaging in a First Amendment [a]ctivity." Doc. 182 at 10. According to Defendants, the fact that Keys observed "inmates writing notes about what had occurred does not establish [Flax's] claim for retaliation against her," Doc. 207 at 13, and Flax's statement that Manning heard him discussing possible grievances fails to establish a causal connection because Flax "admitted that he did not inform … Manning of his intention to file a grievance or lawsuit," *id*. at 15. Defendants add that Keys and Manning completed their incident and disciplinary reports before Flax completed his grievances. Doc 182 at 10.

"Establishing the causation element of retaliation requires a showing that the fact of the plaintiff's engagement in protected activity was a motivating factor of the alleged adverse action … ." *Holleman*, 951 F.3d at 879 (emphasis omitted). Flax submits that he engaged in First Amendment protected activity at Markham Courthouse by threatening to file grievances and discussing potential grievances with other inmates, and that while his speech was not directed at Keys and Manning, they observed it and retaliated against him because of it. Doc. 191 at 14-16. Flax's activities preceded Keys and Manning's reports, so Defendants' timing argument fails. And Defendants do not explain why the causal chain requires that Flax have spoken directly to Keys and Manning and why it is insufficient that Keys and Manning heard Flax discussing his planned grievances. It follows that Flax satisfies the causation element of his retaliation claim against Keys and Manning.

## Conclusion

Defendants' summary judgment motion is granted as to Flax's First Amendment retaliation claim against Bennett, Johnson, Parham, Terrell, Hawk, Matthaya, Fields, James,

14

Anderson, and Morgan, and is otherwise denied. This case will proceed to trial on the surviving claims.

July 30, 2020

_____
United States District Judge

15